IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-628

No. COA21-792

Filed 20 September 2022

Cumberland County, No. 20 CRS 56732

STATE OF NORTH CAROLINA

v.

CHEITO CHARLES, Defendant.

Appeal by Defendant from judgment entered 1 July 2021 by Judge James F. Ammons, Jr., in Cumberland County Superior Court. Heard in the Court of Appeals 7 June 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Haley A. Cooper, for the State.*

*Blass Law, PLLC, by Danielle Blass, for Defendant.*

GRIFFIN, Judge.

Defendant Cheito Charles appeals from judgments entered upon a jury verdict finding him guilty of second-degree arson and felonious cruelty to animals. Defendant argues that the trial court erred by (1) instructing the jury on the doctrine of transferred intent regarding the cruelty to animals charge; (2) denying Defendant's motion to dismiss the cruelty to animals charge for insufficient evidence; and (3) failing to dismiss the cruelty to animals charge due to a fatal defect in the indictment.

We conclude that Defendant received a fair trial, free from error.

## I. Factual and Procedural Background

In July 2020, Defendant lived in a van with his sister, McKumba Charles, located in or around Fayetteville, North Carolina. On some nights, McKumba did not stay in the van with Defendant and instead stayed with her boyfriend, Marcus Perry. Defendant and Marcus knew each other and saw one another "a good amount of times." Defendant testified that he and his sister were "always together[,] so just as much as [Marcus was] around [his] sister," Defendant was around Marcus as well. Defendant also stated that he thought he had stayed at Marcus's house "at least seven times" over the course of one year.

At trial, Marcus described his relationship with Defendant as "[n]ot good." Defendant stated that he and Marcus were friendly but would sometimes "have disagreements about stuff." McKumba suffered from alcoholism, and Marcus testified that "she would drink and get missing and then [Defendant] would be mad at me about her getting missing."

McKumba was drinking heavily while at Marcus's house on the evening of 18 July 2020. Marcus testified that he and McKumba had "[a] disagreement" that night about her drinking: "She wanted more [to] drink that night and I wouldn't go out to buy none so she had left and when I woke up she was gone. I told her I wasn't buying

no more drink. No more liquor and no beer like that so I woke up and she was just gone."

¶ 5    The next morning, at around 9:30 a.m., Marcus travelled to the "parking lot of a gas station across the street from the flea market" in order to sell "some shoes." Marcus testified that he often sold items on the side of the road. At "around 10:30 or 11:00" a.m., Marcus saw Defendant in the parking lot riding his bicycle. Marcus testified that Defendant "was wrapped in a . . . hospital sheet" and was carrying "a sword." Marcus stated that it was his "very first time seeing him wrapped in a sheet with a sword." Defendant then approached Marcus and stated, "Where's my sister?" Marcus stated, "I don't know, she left," to which Defendant replied, "[O]kay, I ain't forgot, I'll be back, I'll be back, I'll be back." Defendant then rode away on his bicycle.

¶ 6    About thirty minutes later, Marcus saw Defendant again on his bicycle. Marcus stated that Defendant "rode by and he just gave me a mean look like, stared real hard and road off on the bike." This was the last time Marcus saw Defendant that day.

¶ 7    Defendant testified that he had driven by Marcus's home several times that day and at one point saw Marcus's neighbor, Anthony. Defendant stated, "[Anthony] didn't see me—he didn't see me but I saw him. I was just watching from afar. But I was watching him." When asked why Defendant was watching Anthony, Defendant stated, "I was just riding around."

¶ 8        Anthony testified that sometime around noon "[a] white van pulled in across the street" at Marcus's house. Anthony confirmed at trial that he observed Defendant driving the van and that Defendant was wearing "like a gown you wear in the hospital." Anthony stated that at first he "didn't really pay that much attention" to the van because he had seen the van at Marcus's house "numerous times" before and had seen Defendant at Marcus's house "quite often." However, about five minutes later, Anthony looked over to Marcus's house and saw that "the porch was on fire." He stated that, at the time he saw the fire, the van "was still there" and "pointing toward the road."

¶ 9        Anthony immediately told his daughter to call 911 upon seeing the flames. He then observed Defendant "walk[] back to the van" and drive away. Anthony watched the fire grow "worse and worse" with flames over the top of the residence while he waited on first responders to arrive at the scene.

¶ 10        About one month prior to the fire, Marcus adopted a puppy. Before leaving for work on the day of the fire, Marcus took the puppy outside to use the bathroom and then put the puppy inside the house. After Marcus got off work, he traveled to his mother's house and his daughter informed him that his house had caught fire. Marcus rushed home and tried to enter the house, but first responders would not let him in. Fire fighters then informed Marcus that his puppy had died and helped

Marcus bury the dog in the yard. Defendant claimed at trial that he did not know Marcus had a puppy.

¶ 11      On 9 November 2020, a Cumberland County grand jury indicted Defendant on one count of second-degree arson and one count of felonious cruelty to animals. The case was tried before a jury on 29 June 2021 in Cumberland County Superior Court. After the close of the State's evidence, Defendant moved to dismiss both charges for lack of sufficient evidence. With respect to the animal cruelty charge, Defendant argued that there was "no evidence that [Defendant] knew of the existence of the [puppy] and much less that there was an animal in the house." The trial court denied Defendant's motion.

¶ 12      After the close of all evidence, the trial court instructed the jury that, in order to convict Defendant of felonious cruelty to animals, the jury need only conclude that Defendant maliciously and "intentionally start[ed] a house fire which proximately result[ed] in the injury or death to the animal." Under this instruction, it was unnecessary for the State to prove that Defendant knew that Marcus had a puppy in the home in order for the jury to find Defendant guilty of felonious cruelty to animals.

¶ 13      On 1 July 2021, the trial judge entered judgments upon the jury's verdict finding Defendant guilty of second-degree arson and felonious cruelty to animals. Defendant timely appeals.

## II.   Analysis

628 STATE V. CHARLES

2022-NCCOA-628

*Opinion of the Court*

¶ 14        Defendant argues that the trial court erred by (1) instructing the jury on the doctrine of transferred intent regarding the cruelty to animals charge; (2) denying Defendant's motion to dismiss the cruelty to animals charge for insufficient evidence; and (3) failing to dismiss the cruelty to animals charge due to a fatal defect in the indictment. We address each argument.

**A. Jury Instruction**

¶ 15        Defendant argues that the trial court erred by instructing the jury on the doctrine of transferred intent regarding the animal cruelty charge, "such that the State had to prove that . . . Defendant intentionally and maliciously started a fire that resulted in the death of an animal, as opposed to being required to prove that [Defendant] intentionally and maliciously killed the animal." We hold that the plain language of N.C. Gen. Stat. § 14-360 adequately supported the trial court's instruction to the jury. We therefore need not decide whether the doctrine of transferred intent is applicable in this case.

¶ 16        First, the State argues that Defendant failed to lodge an objection to the jury instruction and that this issue should thus be reviewed for plain error. However, after the trial court announced the instruction during the charge conference, the judge asked, "Any objection to any of that?" Defendant's counsel then stated, "Your Honor, . . . I don't think saying that the defendant acted knowingly in starting the house fire automatically transfers the intent to harm one—to the animal." Defendant

thus properly objected to the jury instruction.

¶ 17     "It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973). "Whether a jury instruction correctly explains the law is a question of law, reviewable by this Court *de novo*." *State v. Barron*, 202 N.C. App. 686, 694, 690 S.E.2d 22, 29 (2010).

¶ 18     In this case, the trial court's instruction to the jury regarding the charge of felonious cruelty to animals read as follows:

> The defendant has also been charged with felonious cruelty to an animal. For you to find the defendant guilty of this offense, the State must prove three things beyond a reasonable doubt. First, that the defendant caused to be killed a four-month-old puppy in a house fire; second, that the defendant acted intentionally; that is knowingly, starting the house fire; and third, that the defendant acted maliciously. To act maliciously means to act with intent and with malice or other bad motive. . . . It also means the conduct of the mind which prompts a person to intentionally start a house fire which proximately results in the injury or death to the animal.

¶ 19     N.C. Gen. Stat. § 14-360(b) provides that "[i]f any person shall maliciously . . . kill, *or cause or procure to be* . . . killed, any animal, every such offender shall for

every such offense be guilty of a Class H felony." N.C. Gen. Stat. § 14-360(b) (2021) (emphasis added). "As used in this section, . . . the word 'maliciously' means an act committed intentionally and with malice or bad motive." *Id.* § 14-360(c). In other words, one who merely *acts* maliciously is guilty of felonious cruelty to animals under the statute if that act "*cause[s]* . . . to be . . . killed, any animal." *Id.* § 14-360(b) (emphasis added). It is therefore unnecessary in such cases for the State to prove that a defendant knew of or otherwise acted with malicious intent toward the animal. It is enough to prove that the defendant acted maliciously and that the act proximately caused the death of an animal.

¶ 20      Here, Defendant was convicted of second-degree arson, which required the jury to find that Defendant willfully and *maliciously* burned the dwelling of another while the dwelling was unoccupied. *See State v. Scott*, 150 N.C. App. 442, 453, 564 S.E.2d 285, 293 (2002) (listing the elements of second-degree arson). The jury thus needed to conclude only that Defendant maliciously set fire to Marcus's house and that the fire proximately caused the puppy's death in order to support a conviction of felonious cruelty to animals under N.C. Gen. Stat. § 14-360(b). Accordingly, the trial court did not err in so instructing the jury, and Defendant's argument is without merit.

**B. Sufficiency of Evidence**

¶ 21      Defendant argues that "the trial court erred in denying [Defendant's] motion to dismiss for insufficiency of the evidence on the charge of cruelty to animals"

because the State did not present "evidence that the alleged act of animal cruelty was committed intentionally (knowingly) or maliciously (knowingly and with malice)."

¶ 22        We have already held that the trial court permissibly instructed the jury that, in order to find Defendant guilty of felony cruelty to animals, it need only conclude that Defendant maliciously and "intentionally start[ed] a house fire which proximately result[ed] in the injury or death to the animal." It is therefore irrelevant whether Defendant in fact knew that the animal was inside the home at the time Defendant started the fire. Rather, it was sufficient for the State to show that Defendant intentionally and maliciously started the fire which proximately resulted in the animal's death. The State met its burden under this standard. Defendant's argument is without merit.

## C. Indictment

¶ 23        Lastly, Defendant argues that the indictment failed to allege two essential elements of the animal cruelty offense, and thus the trial court lacked subject matter jurisdiction over this charge. Because the indictment sufficiently apprised Defendant of the charge, we reject this argument.

¶ 24        "This Court reviews the sufficiency of an indictment de novo." *State v. Harris*, 219 N.C. App. 590, 593, 724 S.E.2d 633, 636 (2012) (quoting *State v. McKoy*, 196 N.C. App. 650, 652, 675 S.E.2d 406, 409 (2009)). "A valid bill of indictment is essential to the jurisdiction of the Superior Court to try an accused for a felony and have the jury

determine his guilt or innocence, and to give authority to the court to render a valid judgment." *State v. Marshall*, 188 N.C. App. 744, 748, 656 S.E.2d 709, 712 (2008) (quoting *State v. Moses*, 154 N.C. App. 332, 334, 572 S.E.2d 223, 226 (2002)). An indictment requires "[a] plain and concise factual statement in each count . . . assert[ing] facts supporting every element of a criminal offense and the defendant's commission thereof." N.C. Gen. Stat. § 15A-924(a)(5) (2021). "If the indictment fails to state an essential element of the offense, any resulting conviction must be vacated." *State v. Rankin*, 371 N.C. 885, 886–87, 821 S.E.2d 787, 790 (2018).

¶ 25 However, "[t]he law disfavors application of rigid and technical rules to indictments; so long as an indictment adequately expresses the charge against the defendant, it will not be quashed." *Id*. at 887, 821 S.E.2d at 790–91; *see State v. Greer*, 238 N.C. 325, 328, 77 S.E.2d 917, 920 (1953) (holding that an indictment is sufficient where the "offense is charged in the words of the statute, either literally or substantially, or in equivalent words"). "An indictment or criminal charge is constitutionally sufficient if it apprises the defendant of the charge against him with enough certainty to enable him to prepare his defense and to protect him from subsequent prosecution for the same offense." *State v. Coker*, 312 N.C. 432, 434, 323 S.E.2d 343, 346 (1984).

¶ 26 Here, we evaluate whether the essential elements of the animal cruelty charge are "adequately" alleged within the indictment. Inflexible and technical indictment

rules are disfavored. To be fatally defective, the indictment must fail to provide Defendant with sufficient certainty as to the nature of the animal cruelty charge.

¶ 27 Defendant contends first that the indictment failed to allege that the act was carried out "maliciously." However, adequate notice was provided by the accompanying charge for second-degree arson, which explicitly alleged that Defendant "unlawfully, willfully and feloniously did *maliciously* burn the dwelling." (Emphasis added). The indictment provided Defendant with sufficient certainty of the offense committed, such that he was in no danger of subsequent prosecutions, nor would he be unable to prepare a defense.

¶ 28 Defendant further asserts that the "intentional" element was missing from the indictment. We disagree. The indictment alleged that Defendant "unlawfully, *willfully* and feloniously did kill an animal." (Emphasis added). In *State v. Dickens*, the Court observed that the meaning of the word willfully "[as] used in a statute creating a criminal offence, means something more than an intention to do a thing. It implies . . . doing the act purposely and deliberately, indicating a purpose to do it, . . . and it is this which makes the criminal intent." *State v. Dickens*, 215 N.C. 303, 305, 1 S.E.2d 837, 838–39 (1939) (quoting *State v. Whitener*, 93 N.C. 590, 592 (1885)). Thus, as used in the indictment, the word "willfully" adequately expresses that the offense requires an intentional act.

STATE v. CHARLES

2022-NCCOA-628

*Opinion of the Court*

¶ 29     An indictment need only provide an adequate expression of the charge; therefore, this indictment was sufficient to confer subject matter jurisdiction on the trial court.

## III.     Conclusion

¶ 30     We conclude that Defendant received a fair trial, free from error.

NO ERROR.

Judges INMAN and HAMPSON concur.